Having traveled from Mississippi to Louisiana, we now turn to case number 18-30955, Cain v. White. Ms. Dufour? Good morning. May it please the Court. My name is Mindy Nunez-Dufour, and I represent the appellant's judges. Judges hold a special position in CITE by virtue of their sworn oaths to administer impartial justice and their professional codes of conduct. Today, this Court must consider whether the judges are likely to break this oath and abandon their impartiality, not for some personal benefit, because the fines and fees they collect might benefit the courts on which they sit. There are such issues. You acknowledge that perception is an important issue, not — it's not just the actual problem, but the perception of one, or do you dispute that? It is an objective standard, Your Honor, but it is that of an average judge, not of an average man. So it's not — Why does that matter? So — because it's not the perception to an average person. It's a — Well, I think he's asking a little different question. Okay. You're saying that we're judging an average judge rather than an average man sitting as a judge. Correct. He's asking whether, even assuming arguendo, the judge would — is not influenced by benefits, does it matter that a person on the street might think they are? Does that matter to this analysis? It matters to certain ethical analyses, definitely, but does it matter to this one? It does not matter to this analysis. What matters is whether there is an impermissible risk of actual bias, not just a mere appearance to the man on the street. And I think that is why it's important to look at the contemporary cases from the Supreme Court that apply the average judge standard, because in Caperton, especially, the Court goes into a little bit of discussion about how the due process standard sets the constitutional floor, how ethics boards and states and — are certainly free to adopt higher standards of judicial conduct, but we're talking about a due process challenge like the one here. The question is whether an average judge is likely to abandon his impartiality and create an impermissible risk of actual bias, not just appearances. Okay. So then I would agree that if something I did might allow this courthouse to have another coat of paint while I enjoy having nice paint, that isn't really a personal benefit. But what about this malpractice insurance? Isn't that a personal benefit to me, that I'm getting the malpractice insurance for me that I don't have to pay for? I would argue, Your Honor, first that this — Or liability, whatever it was, then. Yeah. That the district — Professional liability. Yeah. The district court classified the interest that we're dealing with here as an institutional rather than direct and personal interest. And we agree with the district court's classification of the interest. To the extent that, Your Honors, consider professional liability insurance a personal interest, then it's a de minimis interest that does not rise to the level of unconstitutionality. Can there be a de minimis interest? Because, you know, if you were saying, let's say the judges could pay themselves a $100 bonus every year, you'd say, well, that's pretty de minimis. I'm not going to, you know, violate the law for $100, but it's an interest. I'm getting $100 I wouldn't have otherwise gotten. And I don't think we say, because maybe the amount of money it takes to bribe Mr. X is less than Mr. Y, that doesn't change the fact that you don't get money like that. Now, I know that isn't the case here. You can't give yourself a bonus. But I'm just not sure de minimis is the question. The question is, benefit to me versus this sort of generic benefit. I mean, we rule on cases — we're all from one of the states in the Fifth Circuit. We rule on cases involving those states all the time. You could say, well, you know, to some extent we benefit from having a nice state of Texas or Louisiana, Mississippi. That's not enough. But if that ruling was going to give me personal money, well, then that's a little bit different. And I don't disagree with that at all, Your Honor. In fact, there is a difference between getting a bonus or getting personal money and receiving some sort of institutional benefit because there's improvement in the courthouse. How do you deal with warrants? Why are you limiting yourself to just the personal — judge's personal financial interest? It seems like the Court's gone much further in Ward and other cases. Sure. Ward can be distinguished on a couple of bases. But if I may just briefly respond to Judge Haynes' question, just one thing to add is that in Aetna, the Court actually considered a judicial impartiality claim against all of the judges who had a personal interest as members of a class in receiving a settlement based upon how they resolved an unsettled question of bad faith law in Alabama, and the Court said that was not enough, that it cannot be just a de minimis interest. It has to — it has to be more than that. In that case, you were dealing with actually direct receipt of money straight into those judges' bank accounts. And to answer your question, Judge, can you remind me very briefly — I'm sorry. We've been talking a lot here about the judge's personal financial interest. Right. But it seems to me that the Supreme Court has gone further than that in cases like Ward. A mayor's institutional interest in the financial well-being of the village was counted against the mayor, even though the mayor got nothing personal out of the ordinances and traffic fines. Sure. And to distinguish Ward, I think it's first important to recognize that Ward was elected to a partisan position in government. He was elected as an executive. Not only was he given additional judicial power, but he was ultimately responsible to the village for funding. Here the judges do not bear that ultimate responsibility. If there is going to be a lack in funding, they can and will and have gone to the city and fought for more funding. In addition, mayors like the one in Ward have an additional interest in lowering taxes, for example. So if they get more revenue from the court, like the mayor in Ward did, almost, I think, 40 or 50 percent of the revenue, then they can offer the citizens lower taxes. This is — these are traits that are unique to an executive. The judges have no sort of executive role. But this money doesn't affect the staff for judges? It does affect the — Personnel? Sure. But no more than — That doesn't matter to the judge? I think that the judges, of course, do care about their personnel, like any other judges, but not so much so — Not just care about them, need them. Of course they need them. And in this court, unlike the court, for example, in Toomey, which was a liquor court, or in Brown, where we're dealing with justices of the peace who could lose their entire position if they don't get cases in their court and generate their own funding, this criminal district court of New Orleans is not going to shut its doors because the judges don't generate enough revenue and fines and fees. But are they going to lose their staff? They may have to make — I mean, and they have in the past. They have not filled positions or they've had to cut salaries, but that's — What percentage of the overall budget came from the fines? Of the overall budget of the court, it varies, Your Honor, but — 20 percent? 25 percent? No. Of the overall budget, no. The judicial expense fund is about $4 million, and fines and fees assessments when the suit was filed was around $1 million. It has since decreased. But the overall budget for the court is not solely reliant on the judicial expense fund. All right. One million sounds like 25 percent of 4 million. Yes, it does. But that's not the overall budget of the court. The overall budget of the court in the record — in the years that we have in the record has ranged from, I think, 7 to 12, 11 or 12. So the overall budget does range because all — One million dollars out of that seems — let's say it went to zero. So let's stipulate your point that this doesn't matter. One million dollars seems like a lot of money if you're comparing it to 7. Yeah. Pretty big cut. Yeah. I think it does seem like a lot of money, but you have to assess the interest in the context of the kinds of interests that the Supreme Court said judges cannot have pursuant to due process. And in Caperton, the court said those are extreme and extraordinary cases. One million dollars sounds like a lot of money. I agree. But it's — it does not — it does not cross that constitutional line like — Would they be forever barred from asking for it from the city? Would they be forever barred? In other words, is it — they were getting it out of the — they were getting it out of the fines. Now they're not. Can they get it somewhere else? Yeah, sure. And they have. And, in fact, if you — I'll try to cite to the record here. Yeah. So if you look at the record at 6071 or the record excerpts at 70, the district court acknowledges that the judges in one day forgave a million dollars in outstanding fines and fees. If they were so dependent on this money, as plaintiffs would have this Court believe, that they — even though they don't bear the ultimate responsibility of the mayor, if they were so dependent on it, here they are in one day forgiven an entire year's worth of fines and fee debts from criminal defendants. You know, I understand your argument about due process is a much more minimal standard than, say, ethics, et cetera, and I think that's a fair point. I want to get an understanding, because there's — somewhere in this sphere, if they were able to give themselves bonuses, you would agree that crosses the line. If they get just zero benefit at all, it's just that they live in New Orleans and the city of New Orleans gets more money, that very generic sort of benefit, we know that would be fine. So we're somewhere in between those two. Where is the line and how is it defined when we're talking about judges as judges? Sure, Your Honor. And the Supreme Court has given us some guidance in this. Very recently, in Williams, they considered a case against a State supreme court judge who had earlier served in the capacity of a district attorney who authorized the death penalty for a defendant, and he was now sitting on the State supreme court deciding post-conviction relief. This is an extreme situation that the Court said this kind of interest is intolerable under due process standards. That was in 2016. We had Caperton in 2009, another very modern, contemporary supreme court case, articulates the average judge standard and asks, when is it too much? And in Caperton, we were dealing with a judge who had previously accepted a $3 million campaign contribution, which was, I think, a million dollars more. If it wasn't a $3 million campaign contribution, it was $3 million spent to support his campaign that he could neither accept nor reject, but they still said that was enough. You're right. And they found that it had a substantial role in getting this judge elected, and that it was so much money, it was more than both of the other candidates' judicial, I mean, campaign committees combined, and I think three times as much as that candidate's campaign committee. And they said this is on the edge, that these are the kinds of cases that test the standards of due process. So here we have essentially what has been described as a litigant buying a seat on the State supreme court, and there that is on the edge of due process. If that's on the edge, and we're trying to figure out where on that spectrum our interest is, the judge's interest here, this institutional interest, is far within the bounds if that divides it down. Well, and I want to explore that. You know, this is why I'm asking for a line, and I'm going to ask your opponent for the line, because to me, yes, of course I want to be able to do my job. I like having this iPad so that I can travel and do my job. But is that a personal interest, doing my job well? That's a little bit weird. Yeah, of course I want to be a good judge. I guess that's a personal interest. But because I want to serve my country. So it's a little hard for me to say that that's the same thing as getting a beach chair at the beach, which is purely personal. I'm having a good time at the beach. Having an iPad to do my job, I'm not thinking that's really fun. I don't play games on it or whatever. I use it for work. So is that fun? Is that personal? It's getting my job done. It's benefiting the country in a small way by me being able to do my job. So that's the problem I'm having, is this notion that anything that makes your job as a public servant easier to do is a personal benefit. I'm a little pushing back on that, which I know helps you and hurts them. But at the same time, we know we have ward, et cetera, and so I'm looking for a line. When does it become? Well, I think if we look to the Commonwealth of Northern Mariana Islands, which is a case from the Ninth Circuit, and they considered whether the assessment of fines and fees that went into a judicial building fund violated due process. They weren't challenging. Here, they're accepting that the judges can make assessments. They're impartial. There's no challenge there. The parties have stipulated to that. I think you might ask plaintiffs where the sort of limiting principle is, where between assessment and ability to pay hearings, do they suddenly lose their interest? Yeah, but that's a different line. I'm looking for the line between when does something go from being this generic, it helps my state that I live in kind of thing that's not enough to cause a problem, to money in my pocket. Where is that line when we're talking about the benefit being solely that I can do my job better because I have staff, because I have an iPad, because I have an office, because the paint isn't crumbling on my head off the wall? Right. So I lost track there. Let me return to Northern Mariana Islands, where the Court says, yeah, these judges do have an interest in the courthouse. But we cannot believe that any judge would impose an unjustified or unreasonable fine to increase the odds that enough money would be collected to build the courthouse. And the Court sort of recognized exactly what you're articulating, Judge Haynes, was that these judges certainly have an interest in increased judicial efficiency, more comfortable courthouse. They have an interest in that. But we just cannot imagine that a judge is going to go up there and impose unreasonable fines just so that they can get a better courthouse and improve their work life. Let me confirm the numbers real quick. I think you said the annual budget for the entire court system of this parish is $7 million, 7 to 12? It's ranged. I'm giving you the range from 7 to 11. And those are the years that before the lawsuit was filed. And we're talking about a million dollars. Approximately. Let me give you the hypothetical. The President and the Congress say if the Supreme Court of the United States votes to support some law, to defend the law against constitutional attack that they really care about, and if you pass that law, if you uphold the law, we'll increase the judiciary's budget by 10 percent. Would the American people have a reasonable concern that that's tainting the Supreme Court? The average man might, but I don't think an average judge would. And I know I'm preaching to the choir here, but by way of example, a conversation between judges or a situation like this, a conversation between judges about how, you know, how good a lawyer is in their courtroom, or may I finish this brief? Sure. Or potentially, well, this lawyer is a mess. They have a, you know, they're never prepared. An average person would put themselves in the shoes of the client of that lawyer. Counsel, your whole argument rises and falls on our determination that there is a different standard as between an average man and an average judge. That, as well as I don't think that the Court's comparison to Ward, even under the average man standard, is fair. Because these judges are not executives. They do not have ultimate responsibility for funding the Court. They do not serve in a partisan branch of government. They do not have to, their jobs, their salaries, do not depend. You're elected on a nonpartisan basis. Is that how they're selected? They are because they have to. No, I'm just asking. Yeah, yeah. Because, for example, in Texas, judges are elected on a partisan basis. So would this come out differently in Texas? But they're not elected. There are popular partisan elections in Louisiana, to answer your question. But they're not elected to a partisan branch of government, like the executive or the legislature. But just tell me, is the Louisiana election of judges, do they have an R or a D or I after their name? They do, Your Honor. They do. So it is a partisan election. It is. Okay. Thank you. Thank you. And the answer to my question is, is it yes or no? I'm sorry. Can you repeat the ultimate question for me? You're out of time. You'll have saved time for rebuttal. So we'll hear from you then. All right. Good morning, and may it please the Court. Rachel Shalev for the Plaintiff's Appellees. The Due Process Clause does not permit judges to have a financial stake in the outcome of their decisions. But that's exactly the position that these judges of the Orleans Parish Criminal District Court find themselves in. Why do you say financial interest? They don't get a salary out of this. So there are two kinds of financial interests, right? There's a personal interest, like money goes into my pocket if I decide a case a certain way, and there's an institutional financial interest. That's just the kind of interest that we had in Ward. So in this case, we have judges who are deciding whether to jail somebody to force the payment of a court debt. But at the same time, those judges in their executive capacity depend on that debt revenue to fund their court. So just as in Ward, you have judges deciding cases that generate revenue for the institution that they manage, revenue that is essential for its function. And so just as in Ward, there is this possible temptation that the judges are going to decide cases in a way that maximize revenue for their court rather than serving the ends of justice. And to be clear, there's no need to question the integrity of any of these judges, of any judge at all. Oh, well, there's no question that's what's happening here. But putting that aside, I've asked your opposing counsel for a line. I think you would agree with me, I hope, that simply a ruling that maybe the state of Louisiana wins a case and I live in Louisiana or I live in Texas and Texas wins is not enough to give me a personal stake, even though, of course, I don't want Texas to fall apart or Louisiana or Mississippi, for that matter. And we also know that if I'm making a decision about what is going to go in my pocket, I'm the litigant in a car wreck case, I can't be the judge of that case. So those are the clear outer edges of this. Where is the line in between? Because, again, I'm not convinced that everything that could make my job easier somehow makes me disqualified to sit. Right, so you don't have to decide what makes something a personal interest, because this case has been litigated under the theory that there's an institutional interest. And I'll give you the line, because this is the line that comes just from Ward. The judges face a possible temptation to be biased in their adjudications when they depend on the money that those adjudications generate to run their court, when they serve as executives of that court and have those executive fiscal responsibilities. Now— Does this principle apply to federal judges? Yes. So, as I'm sure you know, there are some courts that have been accused of essentially biasing their rulings in order to generate income for the—for the court or for the community. You would extend this theory that far? So all judges, whether they're federal or state or, you know, administrative judges or, you know, full Article III judges, are subject to the same basic rule that you can't have a financial stake. Now, if you're trying to decide whether you have an institutional interest present, you have to look at how the system is structured. So does the judge have these sort of executive responsibilities for budgeting? Do they administer something like the judicial expense fund? There is no question that the judges in this case, and I think this is not true of federal judges and it's not true of judges in Texas and it's not true of judges in Mississippi, these judges are administering this judicial expense fund. They have exclusive control over it. But judges make decisions about, for example, attorney CJA funds, how much to pay an attorney who's representing a defendant in the case, and there are budgets for that, you know? There are. And when we have these furloughs and situations where the government isn't, you know, budgeted and so on, they've got to deal with that. And so you've got a situation where somebody may not have counsel if you can't pay the counsel. So, I mean, I'm not sure that judges don't encounter this. There's no way to get around the fact that judges are going to encounter situations where their rulings have an impact on their society. This was true in the era of desegregation and so on, which is ongoing. But in a period when people were subject to death threats and so forth for the rulings they were making, nonetheless, we expected judges to do their job and do it faithfully, whether or not their friends at church or their neighbors or whatever thought they were doing the right thing. So the fact that judges are going to be impacted by their own rulings, that's enough. And I guess I've got to go find another job. So that's not our position. And as this Court said in the Chrysler case, there's a continuum of interest. And that means that some cases are going to be hard, some cases are going to be easy. It's going to be easy if it's just, you know, I'm a taxpayer and this raises money for the taxpayer. You know, Toomey said that's not a problem. There are going to be cases that are easier. And this is an easy case because it's just like ward. In both cases, you have adjudicators who are directly generating revenue for an institution that they administer. Now, in both cases, the judges were not personally benefiting. They weren't getting their salary enhanced. But the Court still said, you know, this is an institutional conflict of interest. But you don't think there's a difference between a mayor who has to perform some judicial roles and a judge? So the key question, and this is from ward and Toomey, is whether the judge has And these judges do. And they've admitted it. They say it at page 5465 in response to our statement of undisputed facts. They say they are charged as administrators and executives to manage the budget of the Court. They acknowledge that they have exclusive control of the judicial expense fund and that they have broad discretion in how to spend it, just subject to that salary limitation. And we know, as Judge Graves mentioned, that they depend on this money. They've said that themselves. And they need it for critical court staff. But what about the fact that it could get funded from elsewhere? So if they lost, you know, let's say the state of Louisiana just did away with fines, so it's not going to have fines anymore. Does that mean that the New Orleans judges wouldn't have any funding? No, they'd go back to the parish or wherever they go to and say, we need some more money. And now they'd raise taxes or do whatever they need to do to get a money. So it was true in Ward, as it is true here, that there were other sources of funding for the institution. But the fact that the judges, you know, can ask the city council, but they can't force the city council, they can't force the state to give them money, puts all the more pressure on them to squeeze the sources of funding that they do control. And here, that's fines and fee revenue. As the district court said... If I may, let me go back to your point about Ward, because I think I hear you saying two different things. Yeah. One is the existence of executive authority. And the other is the judicial need for the money. Why draw the line at the first? Why isn't judicial need alone enough? So I think there are circumstances where that would suffice. That's not this case. It's easier in this case because we know that the judges are controlling it, which means they can guarantee that the money redounds to their benefit. They're not sort of relying on a other decision maker to return the money to them. So that makes the temptation here all the more strong because they can ensure that they are the beneficiaries of the money that they're generating in their court decisions. Now, it might be that dependence in other circumstances would suffice. You don't have to go that far right now because we have this control feature that was present just as in Ward. And I want to take a step back and just flesh out what this ability to pay determination is, because I think it helps us see why there's a lot of room for temptation and what the stakes of this decision are for the judges and for the debtors. So it's a highly discretionary decision. The judges are deciding whether somebody has made a bona fide effort to pay, and then they're also deciding whether they should consider alternatives to imprisonment in response to nonpayment. That's a really sensitive judgment that requires a judge to decide how much money a person needs or how much money her family needs to survive and whether she should be forced to sacrifice necessities like... But there can be frameworks for that. I mean, clearly, you know, Jeff Bezos, if he doesn't pay a fine of a thousand dollars, I mean, there's not going to be a lot of analysis there. Somebody who's a homeless person, if they don't pay a fine of a thousand dollars, not going to be a lot of analysis there. Somewhere in between, obviously, there can be on the edge, maybe you are working, but it's minimum wage, you have five kids and so on. I mean, I get that, but there can be parameters around that. And if a judge is violating those parameters, there can be consequences for that, such as disciplinary action, such as losing an election, such as appeals, such as injunctions. So I don't know that we just have, you know, a bunch of kings and queens running around doing what they want, throwing people in debtors' prison. And my only point is that there's discretion inherent in this decision about whether somebody can pay and what consequence should follow. And once there's that discretion, there's room for temptation. And I want to respond to one of their main arguments against the district court's decision here, which is that they don't actually face an incentive because there's no connection between finding that somebody can pay and actually generating revenue. That's just not right on the logic and it's not right on the facts. If a judge decides that somebody can pay a debt, he can force that payment on pain of imprisonment. And we know from the record in this case that that works. At a time when 95% of the criminal defendants in the Orleans Parish Criminal District Court were indigent, these judges were still collecting 40 to 50% of outstanding debts. We know that even the poorest will find a way to pay if that's what it takes to get out or stay out of jail. They'll give up diapers or medication or, as one plaintiff did in this case, they'll borrow from their grandmother's Social Security disability benefits. People value their liberty. And they will pay whatever it takes. And because this method works and because the judges have this discretion to impose it, there's this temptation. And because they rely on the money that they're generating and because they manage that money, there is a full incentive for them. Now, and I want to just come back to a point that you mentioned at the beginning, which is nobody is questioning these judges' integrity. And the district court was adamant about that. This is a charge that is leveled at the system. But this is a global question. It may not be a question of, you know, Judge White's specific integrity. I get that. But it is a global challenge to the integrity of the judiciary generally by saying, you will let this influence you. I mean, there's no getting around that. So you're absolutely right that the way that this system is set up undermines public confidence in the integrity of the judiciary. And the Due Process Clause doesn't just care about the reality of justice. Judge Ho, as you mentioned, the Due Process Clause also cares about the appearance of justice. And we don't have that in a system like this. And to be clear, nobody likes this system because it hurts everyone. It hurts the debtors, first and foremost, who are denied an impartial adjudicator. It also hurts the judges. Let me ask you this. What if the system were the judges do the fines, the parish administrator does the budget, but everybody knows that if the city doesn't make a certain fine income, they're not going to have enough money to give pay raises to the court clerks or fund access to online research or whatever it is that you care about as a judge? What about that? Is that going to be enough? I mean, it would depend on the amount of money at stake. But if, let's say, the judges know that they're guaranteed to get a return on this money, I think there would be a pretty good indication that they have this So it's kind of, I mean, the reality is anything you do that funds your government can, you know, be of benefit to you. I mean, the judiciary, the federal judiciary has a budget. If the United States has a surplus, then maybe give a little more money to the courts. If they're in a position of cutting the budget and so forth, maybe they give a little less. So then that means anything I do where the government might make money off of it, I can't do. You can't function like that as a judge. This is the problem I'm having with this. So I just want to be clear. There is a way that these judges can constitutionally collect fines and fees. Yeah, we can have a legislative body do an appropriation. Exactly. And that is not what we have here. Exactly. But in hundreds of other situations, legislative bodies determine what the appropriation is. Isn't that right? Right. And this is an executive decision made by the judges to determine how much money the judges get. Yes. And that's what makes this system unique. You just finished, and I asked that. I asked that. I said, what if you know that the reality is that while you're not executing the fine budget, the fine budget impacts your court? So how does that differ from what you just said? It doesn't. I mean, you just answered Judge Graves differently than you answered me. What I meant to say, and pardon me if I didn't say this, is it's only a problem if it's a guaranteed return. So this is what is constitutional. The judges collect fines and fees. They send that money to the general treasury. An independent decision maker, a legislator, the governor, makes a decision about how much money the court needs to operate. That's a decision that, you know, based on the actual costs of operating the court, not based on the amount of money the court generates. But it's never just that. You know that. It's also, how much money do we have? I don't just decide how much I can spend at a restaurant based on whether I think the food's good. It's do I have enough money to pay for this steak, right? And so even if it's not as direct as we have here, it's always going to be there. And your position is then that means those judges are disqualified. So let me see if I can be helpful. Are you essentially asserting sort of an incompatibility doctrine? The judge just simply, it's not compatible for the judge to hold two different positions. One is the judging. The other is controlling the spending of money. But as long as those two things are separate, then the judge is still neutral? Correct. And that's what the court said in Toomey. There's no problem in the abstract with executive and judicial powers combining. The problem is when you have this direct link. And that's what we have here. And the judicial expense fund is the direct link. That's what makes this case unique. Texas doesn't do it. Mississippi doesn't do it. The Federal Government doesn't do it. Now, we don't have to decide, you know, what a harder case, how that would come out. And, you know, a line drawing is inevitable, right? That's what this court said in Chrysler. Some of these cases are going to be hard. These questions of influence are difficult. So we look at precedent. We look at experience. And precedent in this case is squarely on point. This case is just like Ward. You don't have to go one wit beyond Ward to decide that the system that these judges are operating within creates this pressure for them to generate revenue directly from their adjudications. So you do not see a difference between the mayor and the judge? No. They both have executive functions. That's your argument on why Ward applies. You disagree with their position. Correct. And they have admitted that they, and this is at 5465 of the record, they are charged as administrators and executives to manage the court's budget. And in that capacity, they have to make the tough decisions about, you know, whether they're going to fire their closest chamber staff, their law clerk, their secretary, or whether they're going to fix a roof, or whether they're going to put that burden on, you know, the stranger before them in their case. Is there evidence that's happened? In other words, that the fines have gone down and they've had to fire somebody, or the fines have gone up and they've hired people? I mean, do we have evidence of this? So what we do have is they said that in the past, when they haven't had enough revenue, they've had to leave positions unfilled or cut salaries. Counsel referenced that earlier. We also have an additional clue about the kind of system we have here and the kind of influence it exerts. Now, we don't need to show that any judge was actually biased in any case to prevail. That's not the test. Caperton, Aetna, Toomey, Ward don't have to show that. But there is evidence that this is the kind of temptation that would in fact influence the judge's decision, and there are a few pieces of evidence of that. And, you know, Ward noted that these kinds of signs were relevant. So first we know that for years, these judges were assuming that everybody could pay and were jailing indigent people even if they couldn't make a payment. Now, they now acknowledge that that was an unconstitutional practice, but they were doing that and it worked. 95% indigent, 40 to 50% collection. We also know that from 2012 to 2015, these judges were dramatically altering their assessment of fines in a way that benefited the Judicial Expense Fund. So in 2012, when a certain fee became eligible to go into the Judicial Expense Fund, the judges increased the assessment of that fee from 2012 to 2015 by 3,000%. At the same time, they dramatically reduced their assessment of a cost that they have to share with the district attorney. So, you know, this is a... So this is a direct statement about their integrity. I mean, I don't think there's any way to get around that with what you just said. So that evidence only illustrates that this is the kind of thing that we could expect in the aggregate to exert a sort of influence. Well, I don't know that we can expect it. You're saying it happened. And that's one of your arguments. So that is a direct challenge. I'm not faulting you for it, but it's a direct challenge to the integrity of the judges. We're not saying in any particular case they set aside the law and facts. We're just looking at this large-scale evidence. And this is consistent, precisely consistent, with Brown v. Vance, where this Court said very clearly, this is a charge that's leveled at the system, and we don't need to be solicitous nor suspicious of the honor of these judges. And it also looked at this kind of evidence, because it matters how this appears. And when this kind of conduct is happening, it sends a message to the public that they can't trust, have confidence in their judiciary. And that's exactly the problem Ward is designed to solve and that the Due Process Clause protects against. The other point I want to make is the only way that they can get out from Ward, which is squarely on point, is to propose this average judge versus average man test. There's no basis in history or in the precedent for drawing that distinction. And in fact, it's foreclosed by existing precedent. The adjudicator in Ward swore an oath. He was presiding over a criminal case. He was a judge. In Brown v. Vance, this Court applied Ward's possible temptation to an average man as a judge, that test, to full-time judges. They were justices of the peace. And they did, the Court did that in that case because a year before in Marshall v. Jericho, the Supreme Court said very clearly that the rigid requirements of Toomey and Ward apply to officials who are acting, performing judicial functions. That's what the mayor in Ward was doing. That's what these judges are doing here. The Supreme Court in Aetna certainly did not disturb that case. The Court doesn't overrule cases. It doesn't announce new standards by an ellipsis. And we know for sure it didn't do that in Aetna because in the following case in Caperton, the Supreme Court cited both versions of this test. On page 878, they say average man as a judge. 879, it's, you know, average dot, dot, dot, judge. So there's no difference there. And in fact, Caperton confirms that the due process clause is not limited just to direct personal interests. It reaches a broader set of interests, which is what the Court was saying in Ward when it said these institutional conflicts of interest, separate from personal interests, don't need to draw that line, institutional conflicts of interest, where you have an executive who's controlling money for the court he administers has an incentive. I want to go back to my earlier hypothetical. Take a judge who has no executive function. So we're not talking about Ward. But it's a judge in a small town and the judge is perceived of biasing rulings in order to attract more filings to the community. It raises, brings more business in the community. I imagine you can expect a judge to care about the community. That's not unreasonable for a judge to want to improve the welfare of the community just as a citizen. What's your position there? Does your due process theory extend there? So that kind of citizen interest sounds to me like the taxpayer interest that the Supreme Court in Toomey said does not pose this threat. What we have here is, of course, a far cry from that. But it's still quite a, no, I understand this case is different. This is a hypothetical. What I'm intrigued by is why do we draw the line there? Because you can see the same concern about perception. So the temptation grows weaker, the perception less strong, the farther away that the adjudicator is from the financial responsibility. Now, in a certain case, it might be. But why is that? Why isn't it really just about the judge's subjective interests? Well, it's an objective test that looks at whether— I can see a judge caring a lot more about the welfare, a major boon to the economic conditions of the community than a minor increase in the courthouse budget. So that's taking us beyond Ward. And, you know, we'll leave that question for another day. But this case is just like Ward. The same responsibilities, the same dependence that undermines the public confidence. So you're saying we should write affirmed 47-6, Ward, and we're done. That's your argument? That would work for me. Sure. Okay. I'm guessing that Ms. Dufork has something else to say on that. So we'll hear from her. Thank you. I appreciate it. Thank you. And I would like to answer your question, Judge Graves, that it does depend on whether this court applies an average judge or an average man standard because that standard requires us to look at cases that involve judges. And I would just like to distinguish, to me, which is sort of the seminal case, that the Court specifically points out that they're dealing with the system in which inferior judges are paid by convictions. They were dealing with layman judges. So, too, was the Court in Brown. This Court, if you look at the Brown opinion, at footnote 2, we learned that these justices of the peace were lay people serving as judges. And if you look at footnote 8, you see the Brown court sort of lament that this system still exists. It's not required to be a lawyer to be a Federal judge. So is that a lay person serving as a judge if a non-lawyer gets appointed as a Federal judge? But it's the lack of professional standards, professional codes of conduct, and professional ethics. Don't justices of the peace have codes of conduct? I think they'd be a little shocked to find out they don't have professional standards. Well, Your Honor, I think when we're talking about judging the conduct of any professional, we judge it by the average of that professional. So, too, do we do with lawyers or doctors? It's that of an average person with that training and skills and expertise. I'm just not willing to throw justices of the peace in the same bucket as the, quote, average man, whatever that is. I'm merely pointing out that the Court in Brown actually discusses the lack of qualifications of justices of the peace, justices of the peace, the lack of professional qualifications. And I think those qualifications are exactly what gives an average judge more ability to maintain impartiality than that of an average man. What are the qualifications to be a judge in New Orleans, one of these judges that we're talking about? What's the minimum qualification for Judge White to be a Section A of the Orleans Parish Criminal District Court judge? I don't know the answer to that, Your Honor, but I... Well, in Murchison, didn't the Supreme Court supply an average man as judge standard to a judge? In where? Murchison. In Murchison? They quoted Ward while discussing Ward. I think it's more critical to look at Aetna and Caperton and Williamson, who all say average judge. Caperton quotes average judge standard... I guess my question this time is, no, they didn't. I don't think they quote... Average man as judge standard to a judge. In Murchison, I don't think they applied that standard. They started with Ward and they quoted Ward, but there's no in-dense discussion about what's the fact that they applied that standard, whereas in Caperton, you see no ellipses. Average judge is the standard. For Williamson, same thing. We know they were talking about a judge in Murchison. Right? Yes, exactly. Yes. And they quoted language from Toomey. Yes. It was the average man as judge. Yes. I think it's in Ward. Yeah. One of the two, or both. Despite all that, though, you maintain that they didn't apply the average man as judge standard to a judge. Even if they did, we have subsequent Supreme Court case laws, three cases that all apply the average judge standard without question. Well, they overruled Murchison. Or they clarified the standard. I think the standard has evolved as we see new due process challenges against judges. Ms. Cho had a question, too. Oh, yes. Sure. It's possible that this is merely a semantic Ward-Choice distinction, but you submitted substantive, so let me give you a chance. Do you have authority that explains that the average man standard is X and the average judge standard is Y, and that there's a big difference between X and Y? Sure. In Caperton, the Court discusses the ABA standard for judicial qualifications, which is adopted by many States. And that standard, I can tell you, is that of a reasonable man, which is sort of the average man standard. And there's at least one legal scholar, former judge, and member of the Judicial Ethics Committee, explains the difference to say that is the average man standard. However, Caperton applies the average judge standard. That's a standard that's adopted. Your best case for a gulf between these two articulations is Caperton? I think starting with Aetna, but then solidified, cemented with Caperton, and confirmed with Williams. Okay. Thank you. We have your argument. We appreciate both sides' arguments here. And we will take a 10-minute break. Thank you.